## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ———————————————————— ) | | |
| IN RE: ) | **Bankruptcy No. 13-20613-CMB** | |
| ) | | |
| WISHGARD, LLC, ) | **Chapter 11** | |
| ) | | |
| Debtor. ) | | |
| ————————————————————) | | |
| ) | | |
| WILLIAM A. RICE, ) | | |
| ) | **Related to Doc. No. 170** | |
| Movant, ) | | |
| ) | | |
| v. ) | | |
| ) | | |
| WISHGARD, LLC, ) | | |
| ) | | |
| Respondent. ) | | |
| ————————————————————) | | |
| ) | | |
| WISHGARD, LLC, ) | | |
| ) | **Related to Doc. No. 205** | |
| Movant, ) | | |
| ) | | |
| v. ) | | |
| ) | | |
| WILLIAM A. RICE, ) | | |
| ) | | |
| Respondent. ) | | |
| ————————————————————) | | |

## MEMORANDUM OPINION

The matters before the Court are the *William A. Rice Application for Payment of*

*Administrative Expense Claim Pursuant to 11 U.S.C. §503(b)(1)(A)(i)* ("Application") and the

*Debtor's Objection to Proof of Claim of William A. Rice* ("Objection").[1] Due to the similarity of issues and common factual background, these matters have proceeded together culminating in a three-day evidentiary hearing. Following the submission of the parties' briefs and for the reasons stated herein, this Court finds the Application must be denied and the Objection sustained.

## BACKGROUND AND PROCEDURAL HISTORY

Wishgard, LLC ("Wishgard") is a Pennsylvania limited liability company with its principal place of business in Eighty Four, Pennsylvania. Wishgard was formed in approximately June of 2010. The members of Wishgard are Edward "Kip" Tygard ("Mr. Tygard") and Aaron Wishart ("Mr. Wishart"), who possess the majority and minority interests in Wishgard, respectively. Wishgard is in the business of soliciting landowners for the purpose of acquiring oil and gas rights which Wishgard then sells in packages to other companies for drilling on the landowners' property. Wishgard's primary operations have been in West Virginia and Ohio.

The above-captioned bankruptcy case was commenced on February 13, 2013, by the filing of an involuntary petition against Wishgard under Chapter 7 of the Bankruptcy Code. Although the involuntary petition was contested by Wishgard, ultimately, this Court entered an order for relief under Chapter 7 on April 25, 2013. Shortly thereafter, Wishgard's request to convert to a case under Chapter 11 was granted. Since that time, Wishgard proposed a plan which was confirmed on January 30, 2014.

---

[1]     Prior to the evidentiary hearing in this matter, Debtor raised a question regarding this Court's subject matter jurisdiction. Debtor subsequently acknowledged that this Court has subject matter jurisdiction. *See Debtor's Pretrial Brief on Claims of William A. Rice*, Doc. No. 698. Furthermore, this Court finds that it has subject matter jurisdiction pursuant to 28 U.S.C. §§157 and 1334, and that this is a core matter pursuant to 28 U.S.C. §157(b)(2)(B). If the District Court determines pursuant to the rationale set forth in *Stern v. Marshall*, 131 S.Ct. 2594 (2011), that this Court does not have the authority to determine and enter an order on this matter, then the Memorandum Opinion and Order entered shall constitute the Court's proposed findings of fact and conclusions of law and recommendation to the District Court.

Throughout this case, the claims of William "Andy" Rice ("Mr. Rice") have been hotly contested by Wishgard. According to Mr. Rice, he was employed by Wishgard from approximately December 2010 through May 2013. On August 30, 2013, Mr. Rice filed a Proof of Claim alleging unpaid wages and commissions. In an addendum to his Proof of Claim, Mr. Rice sets forth his claim for a total of $27,500.00 in unpaid prepetition salary, a $200,000.00 flat fee, an undetermined commission related to the sale of leases by Wishgard, and an entitlement to payment of an unknown amount of his tax liability on payments made to him by Wishgard. Within the addendum, Mr. Rice noted that additional amounts owed to him would be set forth in an administrative expense claim as those claims arose after the commencement of the case. On October 10, 2013, Mr. Rice filed his Application seeking payment of an administrative expense claim for postpetition commissions and postpetition salary.

In opposition to Mr. Rice's contentions, Wishgard filed *Debtor's Objection to Proof of Claim of William A. Rice* and a response to Mr. Rice's Application.[2] Among the various disputes set forth therein, Wishgard denies Mr. Rice's assertion that he was an employee of Wishgard as opposed to an independent contractor. Wishgard further contests the date identified by Mr. Rice as the date of the agreement to provide a commission and the terms of such payments. Most significantly, Wishgard asserts that Mr. Rice was fully compensated and, in fact, overpaid. Mr. Rice, in turn, filed his *Answer to Debtor's Objection to Proof of Claim of William A. Rice*.

Due to the relatedness of the Application and Objection, the Court set these matters on the same discovery and hearing schedule. The parties filed their respective prehearing statements and a joint prehearing statement. Following the three-day evidentiary hearing, the parties were

---

[2]        On October 24, 2013, the Official Committee of Unsecured Creditors ("Committee") filed a response to the Application. Said response was withdrawn on April 18, 2014. Also on that date, the Committee filed its *Notice of Withdrawal and Reservation of Rights* in which it withdrew from all matters in the bankruptcy case in accordance with the confirmed plan.

provided with the opportunity to file their proposed findings of fact and conclusions of law, post-hearing briefs, and thereafter, reply briefs. As the parties have filed all post-hearing documents, the matter is ripe for decision.

## FINDINGS OF FACT

### Wishgard's Early Operations

Wishgard was created as a result of Mr. Wishart's suggestion that landowners in Ohio needed representation regarding their oil and gas rights. At the earliest stages of Wishgard's operations in the summer of 2010, Wishgard was operated by Mr. Tygard, Mr. Wishart, and Mr. Robert Merashoff. From the beginning, Mr. Tygard was the individual who provided all of the capital for Wishgard's operations while Mr. Merashoff was able to contribute his experience with the leasing of oil and gas rights.

The primary focus of Wishgard's initial work was in eastern Ohio where Wishgard was entering into marketing agreements with landowners pursuant to which Wishgard acted as an agent to assist landowners in finding a developer seeking to acquire oil and gas leases. Under the marketing agreements, Wishgard did not provide any funds to the landowners nor did Wishgard receive any funds simply as a result of entering into the marketing agreements. Rather, the marketing agreements provided Wishgard with an exclusive timeframe within which Wishgard would attempt to find a lease for a landowner and, should that landowner enter into said lease, then Wishgard was to receive eight percent of the signing bonus and a one-half percent overriding royalty interest under the lease.[3]

---

[3]    As described on the record, after production begins such that a developer is receiving a profit on a well, a percentage of those funds is typically paid by the developer to the landowner. When Wishgard was entitled to receive a portion of the royalty paid to the landowner, that interest was referred to as an overriding royalty interest.

Subsequently, in approximately the first week of December of 2010, Wishgard transitioned from using the marketing agreements to signing leases with landowners on behalf of a company known as Tri-Star Energy Holdings, Inc. ("Tri-Star") with the goal that Tri-Star would later reassign said leases to a developer. As was the case under the marketing agreements, neither the landowner nor Wishgard received funds at the time the leases were signed. The leases provided a ninety-day time period from the effective date of the lease for payment of the signing bonus or reassignment of the lease. Pursuant to the agreement with Tri-Star, Wishgard would share in the profits of the reassignment of the leases and receive eight-percent of the signing bonuses due to the landowners as well as a one-half percent overriding royalty interest.

Conducting town hall meetings was one of the methods used by Wishgard to reach landowners. Due to the need for additional assistance at a town hall meeting on or around December 1, 2010, Mr. Merashoff contacted Mr. Rice and invited him to act as a representative of Wishgard to assist landowners in completing leases. Thereafter, Mr. Rice was engaged by Wishgard as a "landman" at a daily rate of $300.00. As a landman, Mr. Rice continued to attend landowner meetings organized by Wishgard and assist landowners in signing oil and gas leases. In approximately January of 2011, Mr. Rice's role with Wishgard expanded as he began to assist Mr. Merashoff in Wishgard's office, along with other individuals; however, there is no record of how much time Mr. Rice was dedicating to his work for Wishgard. *See* Transcript of 9/8/14, Doc. No. 741 ("Transcript I"), at 155-56; Transcript of 9/11/14, Doc. No. 742 ("Transcript II"), at 102-103.

Gulfport Transactions

In early 2011, a developer known as Gulfport indicated its interest in accepting reassignment of Tri-Star leases. Initially, Gulfport committed only to the acquisition of leases

north of Route 70 in Ohio (hereinafter, the "Northern Assignment") and refrained from committing to those leases to the south of Route 70 (hereinafter, the "Southern Assignment").[4] Subsequently, however, Gulfport accepted the Southern Assignment.

In addition, Wishgard and Gulfport agreed that, for some future leases, Wishgard would sign leases on its own paper, as opposed to Tri-Star leases, and Gulfport would deal directly with Wishgard. Wishgard began using its own leases in approximately the second quarter of 2011. One such project has been referred to as the "Guernsey right of first refusal" (hereinafter, "Guernsey Project"), pursuant to which Wishgard undertook efforts to sign landowners to Wishgard's leases in Guernsey County, Ohio. *See* Transcript I, at 47.

With respect to some Tri-Star leases reassigned to Gulfport, Wishgard was entitled to an overriding royalty interest pursuant to its agreement with Tri-Star; however, a settlement had to be reached with Gulfport in order for Wishgard to maintain its right to overriding royalty interest payments, which it continues to receive to date. *See* Transcript I, at 24, 27, 29-30. As to the leases signed on Wishgard's own paper and reassigned to Gulfport, Wishgard was not entitled to an overriding royalty interest. *See* Transcript I, at 29. At least at the time of trial, Wishgard's only sources of overriding royalty interest payments were Tri-Star leases reassigned to Gulfport. *See* Transcript, I at 82.

Although the negotiations with Gulfport began months earlier, Wishgard first received funds from Gulfport in April of 2011. Ultimately, from these transactions with Gulfport, Wishgard received over $16 million in payments from April of 2011 until February of 2012. *See* Exhibits 28 & 29.

---

[4]        The Northern Assignment was comprised of leases in Carroll County, Harrison County, Tuscarawas County, and northern Guernsey and Belmont Counties. *See* Transcript I, at 25-26. The Southern Assignment was comprised of leases in southern Guernsey and Belmont Counties, Monroe County, and a portion of Noble County. *See* Transcript I, at 26.

<u>Mr. Rice's Compensation</u>

The parties agree that, within the first half of 2011, Wishgard, through Mr. Tygard, entered into oral agreements with Mr. Rice regarding his compensation; however the specific timing and terms of the agreements are contested. First, Mr. Rice was promised two flat fees of $100,000.00 (hereinafter, the "Assignment Agreement"), one relating to the Northern Assignment and the other relating to the Southern Assignment. Second, Mr. Rice was offered payment on a commission basis (hereinafter, the "Commission Agreement") pursuant to which he was entitled to either an eight-percent or ten-percent commission on certain net proceeds received by Wishgard. At least as of the time of the Commission Agreement, Mr. Rice was no longer entitled to his daily rate of $300.00, which he initially earned as a landman. *See* Transcript I, at 101-102, 170. Beyond these general parameters, there is a great deal of dispute regarding Mr. Rice's promised compensation.

According to Mr. Rice, both the Assignment Agreement and Commission Agreement (the "Agreements") were made at the same time, and that date is of particular significance to the version of the Agreements he described at trial. Mr. Rice testified that he was promised, as of the date of the meeting, $100,000.00 *for his previous work up to that point* on the leases that Gulfport was acquiring north of Route 70 and, ultimately, another $100,000.00 *for his previous work up to that point* for leases acquired south of Route 70. *See* Transcript I, at 164-65. Going forward from that date, he asserted that he was entitled to an eight-percent commission with respect to Tri-Star leases and a ten-percent commission with respect to Wishgard leases signed thereafter *whether he was involved with the particular lease or not*. *See* Transcript I, at 164; Transcript II, at 26. Accordingly, it is Mr. Rice's position that the proceeds from the Northern Assignment and Southern Assignment may be subject to both the flat fee of $200,000.00 and his

commission dependent upon the dates the particular leases were signed. *See* Transcript I, at 240-42. Mr. Rice understood that he would not receive payment until leases were reassigned. *See* Transcript I, at 164.

Mr. Rice's testimony at trial, however, was somewhat different from the position he adopted in his Addendum to Proof of Claim (Exhibit 1). Within his Addendum to Proof of Claim, Mr. Rice asserted that the date of the meeting was not the same as the effective date of the Commission Agreement, which he contended was March 1, 2011. *Compare* Exhibit 1 *with* Transcript I, at 222 and Transcript II, at 26. This is a significant discrepancy as Mr. Rice went to great lengths to impress upon the Court the importance of the precise date when the meeting occurred. This discrepancy has not been explained to the satisfaction of the Court.

Mr. Rice further contends that the Commission Agreement entitled him to a percentage of any overriding royalty interest received by Wishgard for leases dated after February 11, 2011. *See* Transcript I, at 222-23. In addition to this commission structure, Mr. Rice contends that Wishgard promised to pay the income taxes on all previous payments and on the $200,000.00 payment under the Assignment Agreement. *See* Exhibit 1 and Transcript I, at 252. Going forward from the date of the meeting, Mr. Rice asserts that he was no longer entitled to his daily rate of $300.00. This version of the Agreements is vastly different from that provided by Mr. Tygard on behalf of Wishgard.

Mr. Tygard asserts that the Agreements occurred at different times; however, the specific timing of the Agreements is not as significant to the Agreements as described by Mr. Tygard. He contends that the Assignment Agreement was likely made in mid-February 2011 whereas the Commission Agreement occurred later, likely in the spring of 2011. *See* Transcript I, at 50 and Transcript of 9/25/14, Doc. No. 751 ("Transcript III"), at 33-35. According to Mr. Tygard, the

discussion regarding a commission arose at some point in between the Northern Assignment and

Southern Assignment. Around that time, Wishgard became aware of Gulfport's intention to

provide an "add-on" period to permit Wishgard to sign additional leases to be included with the

existing leases within the Southern Assignment (hereinafter, the "Southern Add-On"). Also,

around the same time, Wishgard began pursuing the Guernsey Project. According to Mr. Tygard,

as opposed to Mr. Rice's commission being dependent upon a particular date, his commission

was project-based. *See* Transcript III, at 32-37. Mr. Tygard asserts that Mr. Rice became entitled

to $100,000.00 for the Northern Assignment, $100,000.00 for the Southern Assignment, and a

commission on other projects as follows: eight-percent commission on the net proceeds received

by Wishgard from the Southern Add-On, eight-percent commission on the net proceeds received

by Wishgard from the Guernsey Project, and a ten-percent commission on net proceeds from

future projects if Mr. Rice was involved throughout the particular project. *See* Transcript I, at 47-

48 and Transcript III, at 32-37.[5] According to Mr. Tygard, the condition of Mr. Rice's

involvement in projects was made clear to Mr. Rice at the time of the agreement.[6] With respect

---

[5]     The Court notes that in *Debtor's Proposed Finding[s] of Fact and Conclusions of Law* the
testimony of Mr. Tygard is misstated. *See* Doc. No. 769, ¶20. The filing asserts that Tri-Star leases were
used on the Guernsey Project. Mr. Tygard testified that the Guernsey Project involved Wishgard leases
and was specified as a project for which Mr. Rice could earn an eight-percent commission. The Court
found Mr. Tygard's testimony to be credible on this point.

[6]     At the September 8, 2014 hearing, Mr. Tygard testified as follows:

        Q. That in your mind, Andy had to have some material involvement in order to have the
        10% commission, is that right?
        A. That's a legal term that I've been educated on that seems to be applicable here.
        Q. When were you educated about that?
        A. Well, the idea was that he would have to show up and do the same type of work and
        produce the same type of work that Rob Merashoff had been producing **throughout the
        process**. It was an incentive.
        Q. Did you expressly state that to Mr. Rice at some point in time?
        A. Absolutely. Absolute **-- from the very beginning**.
        Q. At the time of the agreement?
        A. Yes.

to the future, unidentified projects for which Mr. Rice would be entitled to a ten-percent commission, Mr. Rice would also be entitled to a percentage of overriding royalty payments received by Wishgard. *See* Transcript I, at 100-101. With respect to taxes, according to Wishgard, Mr. Rice was considered an independent contractor who was correspondingly issued 1099 Forms. *See* Transcript I, at 55, 59, 105 and Transcript II, at 215-16.

Upon consideration of the testimony and evidence presented, the Court finds that the credible evidence supports Mr. Tygard's testimony regarding the terms expressed at the time of the Agreements regarding Mr. Rice's compensation, including the condition that Mr. Rice must have been involved in a project to earn his commission. Based upon the credible testimony, the offer of a commission was intended as an incentive to Mr. Rice, and this Court finds that, *at a minimum*, the parties agreed that Mr. Rice's involvement throughout a project to its completion was required. This is consistent with the credible evidence as a number of steps were necessary before Wishgard could profit from a signed lease and thus before Mr. Rice could become entitled to any commission. Wishgard was not guaranteed any profit simply from the act of obtaining a signed lease. Mr. Tygard's description of the Agreements as project-based is also more consistent with the events occurring at the time, specifically the progression of the transactions with Gulfport.

---

*See* Transcript I, at 48 (emphasis added). Mr. Tygard's testimony was consistent with respect to Mr. Rice's required involvement in a project to earn commissions. Simply signing up a lease did not entitle him to a commission but rather his overall participation in the particular project was necessary:

> Q. Wishgard's position is that if it holds an asset, an oil and gas lease on – for some acreage that Andy Rice did not have significant involvement with, that he has no right to a commission on the sale, either past or future sale, of that particular leasehold, or lease.
> A. I'm saying that he voided any potential earnings or incomes by failing to see all projects through completion.

*See* Transcript I, at 122-23 (video clip of Mr. Tygard's deposition testimony).

Furthermore, Mr. Rice's version of the Agreements is inconsistent with the credible evidence. To assert that Mr. Rice's commission was earned as of the time leases were acquired by Wishgard is at odds with Mr. Rice's description of all of the work that is required in an ongoing project.[7] Moreover, if the date of the Agreements was the key to determining Mr. Rice's commission, as he contended at trial, it is inexplicable to this Court why Mr. Rice could not provide the date with absolute certainty from the beginning of this litigation.[8] Further undermining Mr. Rice's purported version of the Commission Agreement is the fact that he has never testified that any document exists which tracked the leases Wishgard signed by date. If Mr. Rice was responsible for the organization of leases in the office and his commission was to be based upon the dates when leases were signed, it is inconceivable that he would not insist that such a document be maintained. Furthermore, Mr. Rice suggests that, after approximately two months of work as a landman at a daily rate of $300.00, one month of which was also spent assisting Mr. Merashoff in the office, Wishgard promised Mr. Rice payment of $200,000.00 for his previous work and a commission going forward on *all* leases, regardless of his involvement.

---

[7]     *See* Testimony of Mr. Rice, Transcript II, at 16:

> You know, it was an ongoing project and, you know, I kind of would be doing acquisitions. I would be doing customer retention. We would be doing title review, curative. So, you know, whether I had one specific function within the company, I would say no. You know, it was a big project with a lot of -- with a heavy workload so, I mean, everybody did different things at different times.

[8]     At trial Mr. Rice asserted that the Agreements were made on February 11, 2011; however, in the documentation attached to his Proof of Claim, Mr. Rice asserted that the meeting regarding the Agreements took place on or about February 25, 2011, and that he would begin earning commissions on leases signed from March 1, 2011, forward, *not the date of the meeting*. Mr. Rice offered the following explanation regarding the difference in dates: "I didn't know the exact date that it happened because I didn't have the information necessary to establish the date at that time." Transcript I, at 236. It is not clear what "information" Mr. Rice is referring to as the only basis he offered to establish the date of the meeting was its proximity to Valentine's Day and his recollection that Mr. Merashoff planned to obtain a loan from his father at this time. Neither of these items provides any assurance to this Court of the accuracy of the date provided. Furthermore, portions of Mr. Merashoff's testimony relating to the loan are inconsistent with the February 11th meeting date. Transcript I, at 104, 125-25 and Exhibit 53.

Such an agreement is far-fetched under the circumstances and inconsistent with even Mr. Rice's statements. *See* Transcript II, at 27 and Exhibit L. In addition, it is noteworthy that many of the leases signed in December 2010, when Mr. Rice began his relationship with Wishgard, were the result of efforts long before his association with the company, as many resulted from landowners who had previously entered into marketing agreements with Wishgard. *See* Transcript I, at 18. The Court finds Mr. Rice's version of the agreement implausible based upon the evidence presented.

In addition, with respect to Mr. Rice's contentions that Wishgard orally agreed to pay income taxes associated with the $200,000.00 owed under the Assignment Agreement or any other payments made to Mr. Rice, the Court finds no credible evidence to support this contention. In fact, all credible evidence indicates otherwise. Mr. Rice was consistently treated by Wishgard as a 1099 independent contractor as opposed to a W-2 employee. *See* Transcript I, at 55.[9] Furthermore, the credible testimony establishes that it was Mr. Rice's desire to be treated as an independent contractor. *See* Transcript I, at 105. It appears that Mr. Rice is attempting to place this obligation on Wishgard in light of his own failure to comply with his tax obligations, and this Court notes that, despite the issuance of 1099 Forms by Wishgard, Mr. Rice has not filed tax returns for 2011 or 2012. *See* Transcript I, at 230. Based upon the credible evidence, Wishgard did not, at any time, agree to pay Mr. Rice's tax obligations.

In addition, with respect to the Commission Agreement, this Court finds that Mr. Rice was promised a percentage of *net* proceeds upon the reassignment of leases. At trial, Mr. Rice indicated his confusion by asserting that he never understood a precise definition with respect to

---

[9]    As discussed *infra*, Mr. Rice later began receiving $2,500.00 biweekly payments. Although initially there was withholding on these payments, that was identified as an error and subsequently corrected, further indicating that Wishgard had no intention of paying taxes on Mr. Rice's behalf. *See* Transcript I, at 175-176; Transcript II, at 215-16.

what constitutes net proceeds under the Commission Agreement. *See* Transcript I, at 244, 246. When deposed, however, Mr. Rice clearly incorporated "overhead" into what would be deducted for the purpose of establishing net proceeds and calculating his commission.[10] Mr. Tygard provided a specific understanding of net proceeds and the intention behind the agreement, which included the deduction of overhead costs. *See* Transcript I, at 117-18. Based upon the credible testimony, this Court finds that the parties understood Mr. Rice's commission was to be calculated based on Wishgard's proceeds after deduction for overhead costs and operating expenses related to the specific projects.

In September of 2011, the payment arrangement between Wishgard and Mr. Rice was modified. The change was prompted by Mr. Merashoff's departure from Wishgard. From around the time of Wishgard's formation, Mr. Merashoff was responsible for the organization and maintenance of Wishgard's office. Although Mr. Merashoff offered Mr. Rice an employment opportunity at the time of his departure, Mr. Rice chose to remain with Wishgard, taking on tasks previously done by Mr. Merashoff. *See* Transcript I, at 57 and 172. The parties agree that Wishgard promised to make $2,500.00 biweekly payments ("Biweekly Payment Agreement") to

---

[10]      Mr. Rice testified as follows at his deposition:

Q. How did you understand your commission would be calculated?
A. How would I understand my commission to be calculated would be on the reassignment less the operating costs.
Q. I think I understand that, but let me try and break that out and see if I do. Was it your understanding that you would be paid the difference between the reassignment and the cost that Wishgard had in obtaining the leases and selling the leases?
A. I don't think that that was stated correctly. I mean if they would sign the lease for a thousand dollars and reassign it for fifteen hundred dollars but they had operating costs, it would be the positive difference between the fifteen hundred and a thousand less the operating costs.
Q. And what did you understand would go into operating costs?
A. Venues, title and, you know, those costs associated with doing the acquisitions.
Q. How about overhead?
A. That would be included in the cost of acquisitions.

*See* Exhibit 52, at 10.

Mr. Rice; once again, however, the parties disagree with respect to the nature of this compensation.

According to Mr. Rice, Wishgard offered him a salary of $2,500.00 biweekly. *See* Transcript I, 172-73. To the contrary, Mr. Tygard asserts that the promise of $2,500.00 biweekly payments was intended to be a draw on commissions. *See* Transcript I, at 59. The only evidence with respect to the nature of the Biweekly Payment Agreement is the contradictory testimony of Mr. Tygard, on behalf of Wishgard, and Mr. Rice. This Court finds the testimony of Mr. Tygard to be more credible on this point. In addition, the Court notes that the facts presented in this case do not indicate that Mr. Rice's role with Wishgard was ever that of a salaried employee. To the contrary, Mr. Rice did not work on a particular schedule and maintained a great deal of independence during his time with Wishgard.

<u>Mr. Rice's Involvement in Wishgard's Projects</u>

According to Mr. Rice, he was generally involved with all of Wishgard's activities from at least the time of his Commission Agreement. He asserted that, he "was the in-house layman that worked in the office" and therefore he touched most files that came into the office. *See* Transcript II, at 26. Notwithstanding this contention, Mr. Rice admits that he did not work on a particular schedule nor did he keep track of his hours. *See* Transcript II, at 13-14. Based upon the credible testimony of Mr. Rice's former co-workers, even at the times Mr. Rice was in Wishgard's office during business hours, he was often not performing any tasks for the company. *See* Transcript II, at 241-42, 246, 248, 256, 261-63. The credible evidence and testimony establishes, and this Court finds, that Mr. Rice was not a consistent fixture in Wishgard's office and he was not involved in *all* of Wishgard's operations throughout his association with the business. It is undisputed, however, that Mr. Rice was involved in the Northern Assignment,

14

Southern Assignment, Southern Add-On, and Guernsey Project. Aside from those projects, as Wishgard focused on obtaining leases in identifiable regions, this Court will address the evidence presented regarding Mr. Rice's efforts in those regions on behalf of Wishgard.[11]

Based upon the credible testimony of Adam Thomas, the project manager for Wishgard in northeastern Ohio, Mr. Rice's involvement in that region was minimal. *See* Transcript III, at 5-12. Mr. Thomas began working for Wishgard around September of 2011 and initiated the town hall meetings in northeastern Ohio on behalf of Wishgard in the areas of Lake County, Geauga County, Ashtabula County, and Trumbull County. Although Mr. Rice initially attended some town hall meetings and assisted with paperwork in that region, his participation was short-lived and diminished when a Wishgard office was opened in the area around October or November of 2011. *See* Transcript III, at 6-7. With respect to the new office's efforts to organize leases, Mr. Thomas found Mr. Rice's limited assistance unhelpful, requiring the new office to create its own spreadsheet for purposes of organization and tracking. *See* Transcript III, at 11-12. Furthermore, despite Mr. Thomas' efforts to reach out to Mr. Rice for assistance with resolving title defects, Mr. Rice failed to provide such assistance. *See* Transcript III, at 7-10. Approximately one year after Mr. Thomas commenced work in the region, in August of 2012, Mr. Thomas ended his relationship with Wishgard to focus on his own business. Although Mr. Rice testified that some work was being done in this region even into 2013, he noted that the office had been closed and new leases were no longer being signed. *See* Transcript II, at 81-82. Based upon the credible evidence, this Court finds that Mr. Rice's involvement was minimal in Wishgard's efforts in

---

[11]    A number of witnesses were called to testify regarding their involvement with Wishgard and interactions with Mr. Rice in particular. Among those witnesses was Daniel Nabuda, a former director of operations at Brighton Resources, Inc., which performed title research and provided consulting services regarding title curative measures to Wishgard in 2012. This Court did not find Mr. Nabuda's testimony to be helpful in determining the extent of Mr. Rice's involvement in Wishgard's projects.

northeastern Ohio during Mr. Thomas' involvement and further cannot determine with any

certainty Mr. Rice's role, if any, following Mr. Thomas' departure from Wishgard.

Around August of 2011, Wishgard was also pursuing leases in Washington County,

Ohio, and in nearby Athens County.[12] Work in this region was initiated and managed by an

independent contractor named Michael Maag. *See* Transcript I, at 106; Transcript III, at 22. Mr.

Maag testified that Mr. Rice would, at times, assist with landowners in this area; however, there

came a time when Mr. Maag contacted the Wishgard office and asked that Mr. Rice no longer

assist at that location based upon his performance. *See* Transcript III, at 26. According to Mr.

Rice, he never visited the satellite office located in Washington County. *See* Transcript I, at

180.[13] Efforts did result in a sale of some leases in this region to Triad Hunter, LLC ("Triad

Hunter") in 2013; however, a number of leases in this region remain in Wishgard's inventory.

Based upon the credible testimony, Mr. Rice did not provide continuous efforts in this region.

Furthermore, he did not participate in this region through the completion of any project as the

sale to Triad Hunter occurred after his departure.

In addition to the efforts undertaken in Ohio, Wishgard was also pursuing leases in West

Virginia by the end of 2011. It is undisputed that Mr. Rice did work in West Virginia and was in

contact with Wishgard's satellite office in that location. *See* Transcript I, 72-73. Mr. Rice was in

frequent communication with an independent contractor, Hal Whitlatch, who was signing leases

on Wishgard's behalf in West Virginia.  Based upon the record, and Mr. Rice's own statements,

---

[12]    Mr. Rice raises three specific leases and/or interests in Athens County in relation to his claim in
this bankruptcy case: (1) a lease between the Debtor and Cottingham Real Estate Trust; (2) a lease
between the Debtor and Mark E. Spezza and Diane R. Spezza; and (3) "deep" oil and gas rights pursuant
to a Letter of Intent between Debtor and M L Miller and Sons, LLC. Based upon the credible evidence
Mr. Rice's role in any of these transactions is not clear.

[13]    Notwithstanding the foregoing, Mr. Rice was clearly involved with at least one particular lease,
referred to as Schaad Dairy, in this region of Washington County and Morgan County even into January
2013. *See* Exhibit 16, at 8-10 and Transcript II, at 245. That lease remains in Wishgard's inventory.

Mr. Rice appeared to have dedicated his energy and efforts to this specific region. In an email

dated February 23, 2013, Mr. Rice expressed to Mr. Whitlatch,

> Understand that by moving into [West Virginia] with you and not working our
> core area in the proven play I have put myself repeatedly out on a limb. It is my
> opinion that this decision will pay off but by doing so [I] alienated myself in
> certain ways from other avenues of me making money.

*See* Exhibit L. *See also* Exhibit 15, at 5. The efforts in West Virginia extended at least into early

2013 when that satellite office closed. This Court finds that, with respect to the services provided

by Mr. Rice to Wishgard from approximately the fall of 2011 through early 2013, Mr. Rice's

efforts were predominantly in West Virginia.

The Court notes that there was limited testimony related to work done in several other

counties. With respect to leases signed in Muskingum County, Ohio, there was no credible

testimony establishing Mr. Rice's involvement in that region. In addition, with respect to the

acquisition campaigns undertaken by Wishgard's satellite offices in Ross County and Pickaway

County, Mr. Rice conceded that he was not a large part of the effort there. *See* Transcript I, at

179. To the extent Wishgard acquired acreage in Coshocton County, Ohio, Mr. Rice's testimony

was that "at that time, Wishgard was not funding leases in Coshocton County, nor ever I

believe." *See* Transcript II, at 35. Accordingly, Mr. Rice must not contend that he was involved

in that region on Wishgard's behalf. Finally, there was no credible evidence to support any

significant involvement of Mr. Rice in leases signed in Holmes County, Ohio.[14]

Based upon the credible evidence, Mr. Rice's involvement and efforts on behalf of

Wishgard fluctuated. It was conceded that at some point in his association with Wishgard, Mr.

Rice was permitted to use the title "Vice President of Land"; however, the significance of this

---

[14]    There was very little evidence presented regarding leases obtained by Wishgard in Holmes
County. With respect to an email from Mark Spezza regarding potential leases in that county, Mr. Rice
testified only that he was involved "[t]o some extent". *See* Transcript I, at 207 and Exhibit 15, at 6.

permission is unclear. *See* Transcript I, at 65. While Mr. Rice produced a business card with this description, it is noteworthy that the title was apparently used by multiple independent contractors for the purpose of establishing credibility with landowners. *See* Transcript I, at 65-66. Furthermore, although the Business & Development Plan dated September 22, 2012 ("Business Plan") identifies Mr. Rice as "Vice-President of Land Acquisitions" for Wishgard, the accuracy of the contents of that document has been questioned even by Mr. Rice. *See* Exhibit 8, at 10 and Transcript II, at 57, 70-71. *See also* Transcript II, at 113. This Court finds that the representations made in the Business Plan for the purpose of pursuing funding are not reliable for determining Mr. Rice's, or anyone else's, role at or association with Wishgard.

Overall, Mr. Rice provided services to Wishgard generally without any apparent oversight or accountability and on his own schedule. *See* Transcript I, at 216; Transcript II, at 13-15. This is not to say that certain inappropriate behavior went unnoticed by Wishgard, and Mr. Rice conceded to some misconduct while providing services to Wishgard. *See* Transcript I, at 232-33 and Transcript II, at 259. According to Mr. Tygard, Mr. Rice's level of performance dropped significantly following the departure of Mr. Merashoff. *See* Transcript I, at 104. In late June of 2012, Mr. Rice's conduct led to the issuance of a suspension letter by Wishgard. *See* Transcript I, at 103 and Exhibit 11. Despite the evident breakdown of the relationship between Mr. Rice and Wishgard, Mr. Rice was never terminated by Wishgard, and he continued providing services to Wishgard through approximately May of 2013. Ultimately, Mr. Rice began

working for Mr. Merashoff in September of 2013.[15]

<u>Payments Made to Mr. Rice</u>

It is undisputed that Wishgard made a number of payments to Mr. Rice, beginning in December of 2010 and continuing through April of 2013, totaling $383,505.00. *See* Exhibit 6. The application of these payments to the various compensation agreements is subject to dispute. As an initial matter, payments made at the daily rate of $300.00 must be excluded from the total to determine the amounts paid pursuant to the Assignment Agreement and Commission Agreement. This Court finds that, at the very latest, Mr. Rice received his daily rate of payment until the time of the Commission Agreement, which was made in approximately April of 2011. Thereafter, Mr. Rice was no longer entitled to his daily rate of pay as a landman. Therefore, payments made from December of 2010 through April of 2011, totaling $13,140.00, included compensation at the daily rate.

Of particular significance and subject to dispute are two lump sum payments made in May and September of 2011 in the amounts of $35,000.00 and $36,250.00, respectively (hereinafter, "May Payment" and "September Payment"). Mr. Rice asserts that, based upon the characterization of these payments in *Debtor's Objection to Proof of Claim of William A. Rice*, these payments are distinct from the monies owed to Mr. Rice under the Assignment Agreement, Commission Agreement, and Biweekly Payment Agreement. Within the Objection, Wishgard

---

[15]    A significant amount of time at trial was spent discussing Mr. Rice's association with Mr. Merashoff after Mr. Merashoff's departure from Wishgard. It is undisputed that when Mr. Merashoff and Wishgard parted ways in September of 2011, it was not on good terms. Upon review of the communications between Mr. Rice and Mr. Merashoff from approximately July through November of 2012, it is apparent that both individuals harbored a great deal of resentment toward Wishgard and Mr. Tygard, in particular. *See* Exhibit M and Transcript II, at 51-52, 56, 58-60. In addition, the messages between Mr. Rice and Mr. Merashoff indicate that Mr. Rice at times assisted Mr. Merashoff in his own business endeavors. *See* Transcript I, at 268 and Transcript II, at 22-26, 46, 49, 51-55, 75, 149-50. In doing so, it appears from the communications that Mr. Rice may have assisted Wishgard's competitor.

identifies the May Payment as "a discretionary non-contractual bonus" associated with the Northern Assignment and the September Payment as "a discretionary non-contractual bonus" related to the Southern Assignment. *See* Exhibit 3. This Court is not convinced, solely based upon the phrasing used in the Objection, that these payments were not made pursuant to the Assignment Agreement. The credible testimony further clarifies the purpose of these payments, and it is clear that the payments were made in relation to the Northern and Southern Assignments. In addition, in the *Answer to Debtor's Objection to Proof of Claim of William A. Rice*, Mr. Rice took the position that the payments were not "discretionary, non-contractual" bonuses and, in fact, made in accordance with the agreements regarding his compensation. *See* Exhibit F, ¶¶11,13. Furthermore, in Mr. Rice's own testimony he characterized the promise to pay $200,000.00 under the Assignment Agreement as a bonus. *See* Transcript I, at 247-48. There is no credible explanation as to why two very substantial lump sum payments made around the time of the closings of the Northern and Southern Assignments would be considered anything else in light of the Assignment Agreement. This Court finds that both the May and September Payments were made by Wishgard to Mr. Rice pursuant to the Assignment Agreement.

Excluding payments made between December of 2010 through April of 2011 to be sure that payments at Mr. Rice's previous daily rate are not included in the calculation, Mr. Rice was paid at least $370,365.00 pursuant to the Assignment Agreement and Commission Agreement. Therefore, Mr. Rice received the full payment of $200,000.00 with respect to the Northern Assignment and Southern Assignment in addition to $170,365.00 paid as commissions or draws on commissions. With the foregoing facts in mind, this Court applies the applicable law to determine whether Mr. Rice is owed compensation from Wishgard.

## CONCLUSIONS OF LAW

As an initial matter, the Court notes the difficulty that results when a complex agreement is not reduced to writing. Accordingly, it became this Court's task to define the agreement of the parties, based upon the credible evidence, for purposes of resolving the Objection and Application.

### Burden

When considering an objection to a proof of claim, a court must apply the shifting burden of proof applicable to these types of proceedings. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). Initially, it is the claimant's burden to allege sufficient facts in support of its claim. *Id.* Upon the filing of a claim in compliance with this initial burden, the burden shifts, and "the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *Id.* at 173-74. Should the objector meet its burden, the burden shifts back to the claimant to establish its claim by a preponderance of the evidence. *Id.* at 174. The burden of persuasion, however, always remains on the claimant. *Id.*

In this case, Mr. Rice alleged sufficient facts in support of his Proof of Claim. In response, Wishgard has contested those facts and produced testimony in support of its position. Wishgard met its burden by producing sufficient evidence which refutes the terms of the Agreements alleged by Mr. Rice. Accordingly, the burden is on Mr. Rice to establish his claim by a preponderance of the evidence.

With respect to Mr. Rice's administrative expense claim, the procedure for establishing such a claim has been described as burdensome. *See Goody's Family Clothing, Inc. v.*

*Mountaineer Prop. Co. II, LLC* (*In re Goody's Family Clothing, Inc.*), 401 B.R. 656, 667

(D.Del.2009), *aff'd*, 610 F.3d 812 (3d Cir. 2010).

> For a creditor to bring an administrative expense claim under §503(b)(1), . . . it
> must, through a process of notice and hearing before the Bankruptcy Court,
> satisfy 'the heavy burden of demonstrating that the costs and fees for which it
> seeks payment provided an actual benefit to the estate and that such costs and
> expenses were necessary to preserve the value of the estate assets.'

*See id.* at 662-63 (quoting *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 533 (3d

Cir.1999)). Accordingly, the burden is on Mr. Rice to establish his prepetition and postpetition

claims.

<u>Oral Contracts</u>

An enforceable contract is established when the parties thereto come to a mutual

understanding, exchange consideration, and delineate the terms of the agreement with sufficient

clarity. *See Fish Net, Inc. v. ProfitCenter Software, Inc.*, No. 09-5466, 2013 WL 5635992, at *3,

2013 U.S. Dist. LEXIS 148661, at *9 (E.D.Pa. Oct. 15, 2013). In this case, the parties do not

dispute that they entered into oral agreements regarding Mr. Rice's compensation. In fact, it is

undisputed that Mr. Rice was promised two flat fees of $100,000.00 with respect to his

involvement in the Northern and Southern Assignments. In addition, the parties do not dispute

that they entered into an agreement whereby Mr. Rice was given the opportunity to earn

commissions ranging between eight to ten percent of Wishgard's net proceeds. Furthermore, it is

undisputed that Mr. Rice actually earned a commission pursuant thereto for his services with

respect to the Guernsey Project and Southern Add-On. Beyond these terms, there was a great

deal of disagreement between the parties.

The Court notes that, "[i]n cases involving contracts wholly or partially composed of oral

communications, the precise content of which are not of record, courts must look to surrounding

circumstances and course of dealing between the parties in order to ascertain their intent." *Boyle v. Steiman*, 631 A.2d 1025, 1033 (Pa.Super.Ct. 1993). "Generally, 'in the case of a disputed oral contract, what was said and done by the parties, as well as what was intended by what was said and done by the parties, are questions of fact to be resolved by the trier of fact.'" *Flowers v. ConnectAmerica.com LLC*, No. 12-4787, 2014 WL 4762643, at *7, 2014 U.S. Dist. LEXIS 135062, at *23 (E.D.Pa. Sept. 24, 2014)(quoting *Johnston the Florist, Inc. v. TEDCO Constr. Corp.*, 657 A.2d 511, 516 (Pa.Super.Ct.1995)).

In this case, the relevant evidence regarding the terms of the oral agreements was primarily the testimony provided by Mr. Tygard, on behalf of Wishgard, and Mr. Rice. The Court found the testimony of Mr. Tygard to be more credible and supported by the surrounding circumstances. As set forth above, based upon the credible testimony and evidence, Mr. Rice was entitled to $200,000.00 related to the sales to Gulfport of the Northern Assignment and Southern Assignment; an eight-percent commission on net proceeds received by Wishgard on the Southern Add-On and Guernsey Project; and a ten-percent commission on net proceeds received by Wishgard on projects in which he was sufficiently involved thereafter plus a percentage of overriding royalty payments related thereto. Mr. Rice failed to provide credible evidence to establish any entitlement to "salary" payments in excess of what was due to him as commissions and further failed to provide credible evidence to support his assertion that Wishgard was responsible for payment of his tax liabilities.[16] In fact, the credible evidence was to the contrary. To the extent Mr. Rice asserts that any of the foregoing terms of the oral agreements constitute

---

[16]     Furthermore, Wishgard asserts the applicability of the Statute of Frauds such that Mr. Rice is unable to establish any oral agreement regarding payment of taxes on his behalf. In response, Mr. Rice contends that the oral agreement falls within an exception to the Statute of Frauds as it was not a gratuitous gesture but rather motivated by business judgment. Not only did Mr. Rice fail to produce credible evidence of such an offer by Wishgard, but further, Mr. Rice did not provide any credible evidence that such an offer would fall within the exception described.

the unexpressed intentions of Wishgard, this Court disagrees and finds based upon the credible evidence that these were the terms of the Agreements.

With respect to these compensation agreements, the Court notes that a great deal of time was spent at trial attempting to define two terms in particular: (1) the manner of determining Wishgard's net proceeds in order to calculate Mr. Rice's commission and (2) the requisite level of involvement in a particular project such that Mr. Rice established an entitlement to a commission.[17] As set forth above, in order to have an enforceable contract, terms of the agreement must be set forth with sufficient clarity. In other words, an agreement that is too vague or indefinite to demonstrate that there was a meeting of the minds does not create an enforceable obligation. *See Fish Net, Inc.*, 2013 WL 5635992, at *6, 2013 U.S. Dist. LEXIS 148661, at *18-19.

The Court begins with whether the parties reached an understanding as to the meaning of net proceeds. As set forth above, this Court finds that, based upon the agreement of the parties, Mr. Rice's commission was to be calculated based on Wishgard's proceeds after deduction for overhead costs and operating expenses related to the specific projects. Although the parties did not specifically identify what these costs were at the time of the Commission Agreement, based upon the credible evidence, it was clearly set forth at the time the agreement was made that the costs, including overhead, associated with a project would be deducted prior to calculating Mr. Rice's commissions. The Court finds that the agreement is not too vague to be enforced with respect to this provision.

---

[17]    The Court notes that Mr. Rice characterizes both of these items as affirmative defenses and, as such, stated that "it was Debtor's burden to prove that (a) Rice was required to be 'materially involved' in a project in order to earn a commission; (b) overhead charges, such as rent and management/employee benefits and bonuses, were to be deducted from the net compensation . . . ." *Reply to Debtor's Proposed Conclusions of Law*, Doc. No. 782, at ¶3. The credible evidence establishes that the parties agreed upon Mr. Rice's entitlement to commissions with certain conditions as set forth herein.

The requisite level of Mr. Rice's involvement, however, poses a more difficult question. Based upon the credible evidence, this Court concluded that the parties understood at the time the Commission Agreement was reached that Mr. Rice's involvement was a prerequisite to earning a commission. Furthermore, this Court found that, *at a minimum*, the Commission Agreement required Mr. Rice's involvement throughout a project to its completion. It is clear that many steps are taken even after a lease is initially signed, including organizing files, obtaining missing information, curing defects, and retaining customers. Once the Commission Agreement was in place, it was clear that Mr. Rice's role had extended well beyond that of a landman paid at a daily rate simply to assist landowners in signing leases. Based upon the credible testimony, the Court understands the parties' agreement to have required at least continued support throughout a project. As Mr. Rice failed to establish any projects aside from the Guernsey Project and Southern Add-On which he assisted to completion under the Commission Agreement, there are no additional projects for this Court to consider. Accordingly, this provision is not too vague to be enforced.

With the terms of the Agreements established, this Court turns to Mr. Rice's Application seeking payment of an administrative expense claim. Thereafter, the Court will address Mr. Rice's Proof of Claim and the Objection thereto.

<u>Administrative Claim</u>

Mr. Rice asserts that he is entitled to payment of an administrative expense claim pursuant to 11 U.S.C. §503(b)(1)(A)(i), which provides as follows:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including--
>> (1)(A) the actual, necessary costs and expenses of preserving the estate including--
>>> (i) wages, salaries, and commissions for services rendered after the commencement of the case[.]

Mr. Rice did little to meet the heavy burden of establishing such a claim.

Section 503(b)(1)(A)(i) specifically requires that the amount owed be for services rendered *after the commencement of the case*. Therefore, the statute looks at the time when services were rendered and it is "irrelevant whether the services . . . performed prior to the filing of the petition continued to benefit the debtor after the case was commenced." *See Former Emps. of Builders Square Retail Stores v. Hechinger Inv. Co.* (*In re Hechinger Inv. Co.*), 298 F.3d 219, 225-26 (3d Cir. 2002). Accordingly, the timing of services is very significant under §503(b)(1)(A)(i).

In this case, Mr. Rice asserts that his administrative expense claim is comprised of postpetition commissions and unpaid postpetition salary. Beginning with Mr. Rice's assertion of a right to postpetition commission, Mr. Rice sets forth his claim as follows:

> First, Rice has a postpetition commission claim arising as a result of the sale of any leases the Debtor acquired between March 1, 2011 and mid-June 2013. Second, Rice has a postpetition commission claim arising as a result of any postpetition royalty payments the Debtor receives from the prepetition sale of leases acquired between March 1, 2011 and the Petition Date.

*See* Application, at ¶12. Thus, Mr. Rice asserts that he has a right to postpetition commissions on future sales and postpetition commissions on royalty payments from prepetition sales. Accordingly, Mr. Rice focuses on the dates when Wishgard received (or will receive) payments in order to assert his administrative claim for commissions. This characterization broadly encompasses services provided prior to the bankruptcy case.

The Application is devoid of any analysis connecting commissions to "services rendered after the commencement of the case" pursuant to §503(b)(1)(A)(i). According to Mr. Rice, there was "little to no" active new leasing done in January through May of 2013 by Wishgard. *See* Transcript I, at 217. Mr. Rice describes customer retention as Wishgard's primary focus at that

26

time; however, Mr. Rice did little to elaborate regarding his role in any particular project during the applicable timeframe. Furthermore, a review of the record and credible evidence does not establish what postpetition services were provided by Mr. Rice to Wishgard entitling him to any specific commission. While Mr. Rice may have been providing services to Wishgard after the commencement of the case, Mr. Rice did not establish that these services entitled him to a commission pursuant to the Commission Agreement as he asserts. Accordingly, Mr. Rice failed to meet his burden with respect to an administrative expense claim for commissions.

The second portion of Mr. Rice's administrative expense claim is a claim for unpaid postpetition salary. This Court found, based upon the credible testimony and evidence, that Mr. Rice was paid biweekly payments as advances on commissions. Accordingly, Mr. Rice has not established any entitlement to "salary" payments as separate compensation from his commissions. Therefore, Mr. Rice failed to meet his burden with respect to his administrative expense claim for postpetition salary.

The Court now turns to Mr. Rice's Proof of Claim and the Objection thereto.

<u>Objection to Proof of Claim</u>

Mr. Rice's claim is based upon his alleged status as "a former employee and former Vice President of Land of Wishgard" and purports to consist of unpaid wages and commissions. *See* Exhibit 1. Within the Addendum, Mr. Rice's claim is generally comprised of two parts: (1) amounts due for unpaid salary and (2) amounts due as commissions on sales.

First, with respect to unpaid salary, Mr. Rice asserts that he is owed $27,500.00 for the time prior to the entry of the order for relief. Of that amount, Mr. Rice asserts $19,725.00 is entitled to priority pursuant to 11 U.S.C. §507(a)(3) and (4). Section 507(a)(4)(A) prioritizes "unsecured claims" up to a specified amount "earned within 180 days before the date of the

filing of the petition . . . for wages, salaries, or commissions . . . ." At the time this case was

commenced, the statutory cap was $11,725.00, and Mr. Rice asserts that his claim is entitled to

priority in the full amount allowed under the statutory cap. Section 507(a)(3) addresses certain

claims arising after the filing of an involuntary petition by prioritizing "unsecured claims

allowed under section 502(f) of this title." Section 502(f) provides:

> In an involuntary case, a claim arising in the ordinary course of the debtor's
> business or financial affairs after the commencement of the case but before the
> earlier of the appointment of a trustee and the order for relief shall be determined
> as of the date such claim arises, and shall be allowed under subsection (a), (b), or
> (c) of this section or disallowed under subsection (d) or (e) of this section, the
> same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. §502(f). For purposes of §507(a)(3) in this case, the involuntary petition was filed on

February 13, 2013, and the order for relief was entered on April 25, 2013. Mr. Rice asserts that

$8,000.00 of his claim is entitled to priority under §507(a)(3).

With respect to the sales to Gulfport, Mr. Rice asserts that he is entitled to payment of the

$200,000.00 flat fee under the Assignment Agreement and commissions pursuant to the

Commission Agreement. Also, Mr. Rice sets forth his entitlement to payment of his tax liability

arising from all payments made to him up until the time that he became entitled to a commission,

including the tax liability with respect to the $200,000.00 flat fee. In general terms, Mr. Rice also

includes in his claim an entitlement to commission on any other pre-petition sale.

Within the Objection to Claim, Wishgard contends that Mr. Rice was paid advances on

his commissions resulting in Mr. Rice receiving more than the amount he was entitled to receive.

Notwithstanding this position, Wishgard asserts that it never requested or demanded a return of

the commissions advanced to Mr. Rice.

Mr. Rice included in his Proof of Claim sales to Gulfport and any other prepetition sales.

As stated, *supra*, Mr. Rice's entitlement to commissions on the Southern-Add On and Guernsey

28

Project is uncontested, although the specific amounts remain subject to dispute. In addition, Mr. Rice suggests that other revenue is subject to his commission, and he offered calculations in support of a proposed total amount owed. These calculations were presented in a report dated June 10, 2014, ("Report") and a supplement ("Supplement") dated September 24, 2014, prepared by Ms. Kelly Byers, who testified at trial as an expert in the field of accounting. *See* Exhibits 52 and 58. In addition to the Guernsey Project and Southern Add-On, the Report and Supplement assume that Mr. Rice is owed commissions related to the following: the Muskingum Project, Other 2012 Net Revenues, May 2013-December 2013 Net Revenues, 2014 Net Revenues related to the sale to Triad Hunter, and additional sales of acreage in Belmont and Guernsey Counties as identified in the Supplement. *See* Exhibit 52, at 6 and Exhibit 58, at 2.

First, with respect to the reference to the Muskingum Project, that project was excluded by Wishgard for purposes of calculating Mr. Rice's commission and it appears that Ms. Byers' calculation similarly excludes the amount attributed to the Muskingum Project. *See* Exhibit R and Exhibit 52, at 3 and 78. Furthermore, this Court has held that under the Commission Agreement, Mr. Rice must demonstrate involvement in a project to establish entitlement to a commission. Mr. Rice provided no credible evidence of his involvement with respect to the Muskingum Project, and this Court finds no entitlement to a commission related thereto.

With respect to the "Other 2012 Net Revenues" included in Ms. Byers' calculation, it appears that these revenues resulted from transactions with the following entities: Hess Corp.,

Leoni, and Shale Investment Group. *See* Exhibit 52, at 61 and Exhibit 29.[18] Based upon the evidence presented, this Court cannot determine Mr. Rice's involvement, if any, with said projects. Accordingly, Mr. Rice failed to meet his burden to establish an entitlement to commission on this amount.

As to the May 2013-December 2013 Net Revenues, the Court cannot determine the associated projects with the alleged commission earned. Even the Report provides "due to the lack of information we are unable to determine the specifics of these sales." *See* Exhibit 52, at 5. The calculation of commissions owed to Mr. Rice is based upon the following assumption: "If all amounts received during these months resulted from leases acquired by Wishgard during Mr. Rice's employment and all were on Wishgard documents, he would be entitled to ten percent of $80,523, or $8,052 in commissions." *See* Exhibit 52, at 5 (emphasis removed). The assumption fails to account for Mr. Rice's required involvement in projects. Mr. Rice failed to establish an entitlement to commissions on the May 2013-December 2013 Net Revenues referred to in the Report.

In addition, Mr. Rice asserts that he is entitled to a ten-percent commission on proceeds received by Wishgard from a sale of leases located in Washington County, Ohio, to Triad Hunter. *See* Transcript I, at 223. Mr. Rice's claim fails for several reasons. First, although Mr. Rice was involved in this particular region to an extent, he failed to establish his involvement in this project. Furthermore, at the very least, Mr. Rice was required to participate throughout the project in order to earn a commission. The sale to Triad Hunter occurred well after Mr. Rice's

---

[18]     Mr. Rice has identified several sales of leases by Wishgard for which Wishgard received payments in 2012. The payors are identified as Hess Corp., Leoni, and Shale Investment Group. With respect to Leoni, it appears that Mr. Rice was not involved in this transaction as he testified that he believed Leoni was related to a lease in Washington County, Pennsylvania, and handled by Mr. Merashoff. *See* Transcript II, at 55-56. With respect to the others, the Court cannot determine the regions or leases related to these transactions. Upon a review of the testimony, this Court is unable to determine if Mr. Rice was involved in these projects.

departure from Wishgard. *Cf. Flowers*, 2014 WL 4762643, at *9-10, 2014 U.S. Dist. LEXIS 135062, at *27-30 (holding that, where a plaintiff provided full performance to earn his commission, subsequent termination of the contract would have no effect on the defendant's obligation to plaintiff). Mr. Rice failed to establish that he earned a commission related to this project.[19]

To the extent that the Report was supplemented in an effort to establish additional commissions owed to Mr. Rice, the Court finds the Supplement does not offer any meaningful assistance to determine commissions owed to Mr. Rice. The calculations contained in the Supplement are based upon documentation showing that a number of Tri-Star leases for acreage in Belmont and Guernsey Counties, signed after February 11, 2011, were later reassigned to Gulfport. No investigation was made as to whether any or all of the leases contained in the exhibit were part of the Northern or Southern Assignment for which Mr. Rice was entitled only to a flat fee of $200,000.00, which he received. *See* Transcript III, at 105, 129-30. The Supplement will not be considered any further.

In addition to the foregoing, Mr. Rice asserts that he is entitled to a commission on future sales of leases acquired by Wishgard while he was associated with the company. Wishgard provided an inventory of both its "unfunded" and "funded" leases. *See* Exhibits 46 and 49.[20] Neither category of leases is guaranteed to become part of a sale such that proceeds will be

---

[19]    The Court further notes that, even had Mr. Rice established entitlement to a commission, the calculation of his suggested commission is problematic. While Ms. Byers calculates a total of $159,321.59 of commissions owed to Mr. Rice relating to Triad Hunter, the calculation is unsubstantiated and unreliable. *See* Exhibit 52, at 129 and Transcript II, at 177-178. It is noteworthy that Ms. Byers' calculation with respect to the sale to Triad Hunter is based upon an estimation of cost per acre provided by Mr. Rice and is potentially missing deductions for costs associated with the project. Furthermore, the credible testimony establishes that the cost of land was more than $1,000.00 per acre for some landowners and that additional costs associated with the project existed. *See* Transcript III, at 61-62.

[20]    While a landowner with an unfunded lease has not received payment and can take action to terminate the lease, such as by sending a letter to Wishgard, "funded" leases are those leases for which the landowner has been paid a signing bonus and thus cannot void the lease. *See* Transcript I, at 88, 90. Accordingly, a funded lease can only expire by its own terms. *See* Transcript I, at 90.

received by Wishgard. It is clear that Mr. Rice cannot establish even the minimum level of required participation to entitle him to a future commission with respect to any of these leases. Mr. Rice did not establish, and cannot establish as these leases remain only in Wishgard's inventory, that he assisted with any project related thereto to completion. Presumably, these ongoing projects continue to be maintained by those presently working for Wishgard. Furthermore, the inventories of leases consist of hundreds of pages of spreadsheets which categorize leases by region. Whether Mr. Rice assisted in acquiring or providing services related to any of these leases is unclear and no attempt was made to distinguish the leases added to Wishgard's inventory after Mr. Rice's departure. Therefore, Mr. Rice failed to establish any entitlement to commissions on future sales and his request for a declaratory judgment in that regard must be denied.[21]

In consideration of the foregoing, only the Southern Add-On and Guernsey Project remain to be considered in ruling on Mr. Rice's entitlement to commissions as set forth in his Proof of Claim. The Court has reviewed Ms. Byers' Report to determine Mr. Rice's position on how his commission should be calculated. The Report, however, offers little assistance to the Court.[22] Ms. Byers' extremely limited view of appropriate deductions from revenue before

---

[21]    The Court notes that, while Mr. Rice predominantly provided services in West Virginia, Wishgard has asserted that a number of leases in West Virginia were released due to inability to make any sale or assignment. *See* Exhibit 3, at 6, n.3. The Court notes that Wishgard's inventory reveals that it currently holds only six funded leases in West Virginia. *See* Exhibit 46. Even Mr. Rice's work on those particular leases is unknown.

[22]    Ms. Byers offered her understanding of the meaning of "net proceeds" based upon her own standards of reasonableness and interpretation of the oral Commission Agreement. *See* Transcript II, at 157, 181-82, 188 and Tab 11 of Exhibit 52. As Ms. Byers conceded at trial, the term "net" is not precise and is susceptible to different meanings. Transcript II, at 188. Nonetheless, Ms. Byers assigned her own meaning by applying the definition of "net revenue" from an accounting perspective, which she used in formulating her opinion of what commissions are owed to Mr. Rice. Transcript II, at 155. The Court finds Ms. Byers' opinion of the Commission Agreement to be inconsistent with the credible evidence.

calculating commissions is vastly different from the terms agreed upon by the parties.[23] Mr. Rice's commission was to be on Wishgard's proceeds after deduction for overhead costs and operating expenses related to the specific projects. Wishgard provided a spreadsheet setting forth these expenses related to the Guernsey Project and Southern Add-On and deducting the totals from proceeds received by Wishgard to calculate Mr. Rice's commission totaling $88,750.38.[24] Mr. Rice failed to establish that Wishgard's calculation of commissions owed to him is inconsistent with the Commission Agreement.

Furthermore, with respect to Mr. Rice's assertion of entitlement to any percentage of overriding royalty interest, Mr. Rice failed to meet his burden. Mr. Rice was not entitled to any percentage of overriding royalty interest on either the Southern Add-On or Guernsey Project under the Commission Agreement. The Commission Agreement entitled Mr. Rice only to a percentage of any overriding royalty interest received by Wishgard with respect to projects subsequent to the Southern Add-On and Guernsey Project in which Mr. Rice was involved and otherwise due a commission. None have been established.

Based upon the foregoing, excluding any payments potentially made at Mr. Rice's original daily rate, Mr. Rice was paid $370,365.00 under the Assignment Agreement and

---

[23]     Wishgard itemizes the deductions from revenue for the Southern Add-On and Guernsey Project for total deductions of $1,864,157.92. *See* Tab 8 of Exhibit 52. Ms. Byers' Report reduces the amount of appropriate deductions to $434,137.47, characterizing these as "Costs Directly Related to Acquisition of Land Rights", thereby adding $1,430,020.45 back into revenue upon which Mr. Rice is due a commission. *See* Tab 11 of Exhibit 52. Ms. Byers re-categorized numerous deductions to achieve this result, mostly without any clear explanation. At trial, Ms. Byers conceded that some deductions which she excluded should have been included even under her limited view of net revenue. *See* Transcript III, at 144-45.

[24]     The Court notes that certain expenses deducted date back to March of 2011. Mr. Rice contends that this is evidence that the Commission Agreement occurred prior to March of 2011. First, the Court determined that the agreement was project-based and not dependent upon the date the agreement was made. Second, it is certainly possible for costs related to a project to have accrued prior to the formation of the Commission Agreement if the project was ongoing at that time. The Court is unconvinced by Mr. Rice's argument.

Commissions Agreement. As previously determined, Mr. Rice failed to establish any entitlement to biweekly salary payments in addition to any obligation of Wishgard for payment of his tax liability. Therefore, Mr. Rice received full payment of $200,000.00 with respect to the Northern Assignment and Southern Assignment in addition to $170,365.00 paid as commissions or draws on commissions. It has been established that Mr. Rice earned $88,750.38 in commissions. Accordingly, he has been paid in full.[25] Therefore, to the extent that Mr. Rice asserts that he is entitled to liquidated damages and attorneys' fees under Pennsylvania's Wage Payment and Collection Law ("WPCL"), his claim fails as he has not established that he is an employee to whom any wages are payable. *See* 43 Pa. Stat. Ann. §§260.9a, 260.10. The WPCL simply provides a vehicle to enforce payment where an employee establishes an entitlement to compensation under the terms of an agreement. In this case, Mr. Rice failed to establish that he is entitled to any further compensation pursuant to the Agreements with Wishgard.[26]

---

[25]    Based upon the credible testimony, Mr. Rice was provided an advance on his commissions to assist him in purchasing a home. To the contrary, Mr. Rice characterized the funds totaling $88,800.00 as monies owed to him as commissions. *See* Transcript I, at 258. Mr. Rice's text message expressing his excitement and gratitude to Mr. Tygard around the time of the transfer supports Wishgard's characterization of an advance. *See* Exhibit G. Notwithstanding the purpose of the funds and without notice to Wishgard, Mr. Rice did not use the money to purchase the home. *See* Transcript I, at 258-59.

[26]    The Court further notes that the WPCL is only applicable where the claimant is an employee, a term which is not defined by the statute. *See Morin v. Brassington*, 871 A.2d 844, 849 (Pa.Super.Ct. 2005). In this case, this Court is unconvinced that Mr. Rice was an employee of Wishgard. Although Mr. Rice asserts that the issuance of a suspension letter in June 2012 indicates that Wishgard controlled the manner in which his work was to be accomplished, this Court disagrees. First, Mr. Rice clearly did not believe that Wishgard controlled him as his response to receipt of the letter was to simply roll it up in a ball and throw it out. *See* Transcript II, at 13-14. Mr. Rice returned from suspension without complying with the terms of the letter. *See* Transcript I, at 263-65. In addition, as explained by Mr. Tygard, due to the advance provided to Mr. Rice to assist him in purchasing a home, Mr. Tygard believed at the time of the suspension letter that Mr. Rice owed Wishgard services. *See* Transcript III, at 66. The credible evidence establishes that Mr. Rice worked without set hours, on his own schedule, without any apparent oversight, and with a desire to remain an independent contractor. As further evidence of his independent status, Mr. Rice provided services to Mr. Merashoff's company and Wishgard contemporaneously. *See* Transcript II, at 35, 46, 123. To the extent that Wishgard has offered as an alternative defense to Mr. Rice's claim that some of the services provided to Mr. Merashoff constituted a breach of loyalty to Wishgard, this Court need not address that contention as the Court finds that no compensation is owed to Mr. Rice.

Based upon the record, it is likely that Mr. Rice overestimated the amounts he would earn under the Commission Agreement and underestimated the costs associated with the business. Given the nature of the oral agreements for his compensation, Mr. Rice had no way of knowing how much he earned until a sale was completed. While he may be disappointed with the results of the calculations, he has not established that any amounts remain due.

## CONCLUSION

Therefore, based upon the foregoing, the *William A. Rice Application for Payment of Administrative Expense Claim Pursuant to 11 U.S.C. §503(b)(1)(A)(i)* is denied, and the *Debtor's Objection to Proof of Claim of William A. Rice* is sustained. An appropriate Order will be entered consistent with this Memorandum Opinion.

Date: January 13, 2015                                    ___/s/ Carlota M. Böhm_____
                                                         Carlota M. Böhm
                                                         United States Bankruptcy Judge

**MAIL TO:**
        Office of the United States Trustee
        Richard J. Parks, Esq. and John W. Kettering, Esq.
        W. Patrick Delaney, Esq. and Nicholas R. Pagliari, Esq.

FILED
1/13/15 12:25 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA